| | |
|---|---|
| MARISA BELLE ADAM,<br><br>       Plaintiff,<br><br>    v.<br><br>OBAMA FOR AMERICA,<br><br>       Defendant. | No. 15 C 4043<br><br>Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

Marisa Adam, who is African-American, alleges she was discriminated and retaliated against on account of her race when she worked for Obama for America ("OFA"), in violation of 42 U.S.C. § 1981 and in breach of an alleged contract between Adam and OFA. R. 52. OFA has moved to dismiss Adam's claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 56. For the following reasons, OFA's motion is granted.

## Legal Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## Background

On September 2, 2011, Adam received an email offering her a fulltime internship position in OFA's political department in Chicago. R. 52 at 1, 13. The online application notes that internship positions at OFA "are unpaid, volunteer positions," and that interns "will not receive financial compensation from any person or entity, including any corporation, for any services [interns] provide to the campaign." *Id.* at 18. Adam began work on September 19, 2011 by participating in a new hire orientation. *Id.* at 1. Adam was also given a laptop to use on her first day and told about OFA's policy regarding its use. *Id.* Adam also received a key card. *Id.* at 3.

Adam was the only African-American in the political department. *Id.* at 3. On September 25, 2011, six days into her internship, Adam sent an email to the Intern

Coordinator, Kate Cummings, asking to have a meeting because although she was "having a blast and really happy," she was "not necessarily comfortable working with some of the interns in the political department." *Id.* at 17. At their meeting the next day, Adam told Cummings that she felt uncomfortable as the only African-American in the department and that she "wanted to switch groups after being left out of meetings and being treated rudely." *Id.* at 3. Adam does not describe Cummings's response or the immediate outcome of their meeting. Adam alleges that Cummings told Abigail Witt (the "Political Director of Operations" and supervisor of the interns in the political department) about their meeting on October 4, 2011. *Id.*

Adam alleges that other interns were disrespectful to her and excluded her from group activities. *Id.* at 3. She alleges that Cummings and other interns laughed at Adam's expense and gave her dirty looks. *Id.* Adam alleges two additional incidents with Cummings in October 2011. On one occasion, Cummings allegedly "pulled Adam's hair, inspected her scalp, and told her how to wear it." *Id.* at 4. On a separate occasion, "while passing in the hall, Cummings touched [Adam's] skin and said, 'ooh.'" *Id.*

Despite these events, Adam wanted to continue to work for OFA. In November 2011, Adam informed both Cummings and Witt that she wanted to stay on "after December 16" and after "January 9, 2012." *Id.* at 4. Adam alleges that Cummings and Witt "solely presented [the] African American Leadership Council as an option for her to switch to after December 16, 2011." *Id.* Adam had a meeting

with the finance department and learned that there might be an opportunity for her there. *Id.*

On December 1, 2011, Adam met with Sheena Patton, OFA's Director of Human Resources, and told her that Cummings and Witt were mistreating her because she was African-American. *Id.* at 4. Patton told Adam that she had the option to file a complaint. *Id.* Adam noticed that Witt witnessed Adam leave Patton's office, so Adam returned to Patton's office to tell her that she was scared that Witt had seen them talking. *Id.* Witt later screamed at Adam that she had "to leave the campaign." *Id.* According to Adam, Witt told her "that if the President loses she was sure he had something else planned and Adam could look into those options after the campaign." *Id.* Witt again suggested that Adam look into working with the African American Leadership Council "because it was good for her." *Id.* at 5. Witt also "told Adam that she saw that Adam worked hard and was dedicated to the campaign." *Id.*

After this conversation with Witt, Adam told Human Resources she wanted to transfer out of the political department for the time being until she started with the finance department. *Id.* at 5. Later, Witt again screamed at Adam and "told her to pack her things up and leave" because "it was Adam's last day." *Id.* In response, Adam told Witt that she was transferring to the finance department. *Id.*

The next day, Adam sent an email to Human Resources explaining that she was being mistreated and was interested in filing a complaint. *Id.* Two days after that, Adam met with Patton and two other Human Resources employees. *Id.* Adam

recounted how Cummings, Witt, and the interns in the political department had been mistreating her. *Id.* at 5-6. Patton explained that Cummings and Witt had "provided conflicting information from what Adam was telling her." *Id.* at 6.

Adam alleges that "[a]s a result of her complaints to Human Resources against two White supervisors [i.e., Cummings and Witt]" Patton demoted Adam from "intern" to "volunteer." *Id.* This meant that Adam had to return the laptop she was issued and instead use her personal laptop. Adam alleges that this also meant that "she would no longer be helped by Human Resources with obtaining a paid position." *Id.* at 8, 10. She also alleges that as a "volunteer" she did not have the "sessions with senior campaign staff, networking opportunities, and interviews" that "interns" had. *Id.* at 10.

At some point thereafter, Adam began working with Lora Whitticker in the finance department. *See id.* at 26; R. 62 at 11. On January 16, 2012, however, Adam sent Whitticker an email stating that she needed to "take a leave of absence . . . due to everything that happened over the past few months." R. 52 at 26. Adam alleges that other OFA interns who were white and had lesser credentials went on to paid positions associated with the President and the Democratic Party. *Id.* at 9-10. Adam alleges that she suffered "psychological and professional damage," and that she "remembers not eating or going to the bathroom because she was anxious and scared of interns, Cummings, and Witt." *Id.* at 11. She also alleges that she suffered from "anxiety, depressions, loss of appetite, sleep disturbances, low blood pressure, weight loss, and other conditions," as well as "panic attacks[,] fear[] [of] leaving the

places she lived in . . . . [and] struggles with getting out of bed and eating for months." *Id.*

**Analysis**

Adam alleges that her internship with OFA constituted a contractual relationship, and that OFA's actions towards her breached that contract and constitute discrimination and retaliation in violation of 42 U.S.C. § 1981. Both breach of contract and Section 1981 require the existence of a contractual relationship.

Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." *Id.* § 1981(a). The phrase "make and enforce contracts" means "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). In order to succeed in a Section 1981 lawsuit in the employment context, "a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013); *see also Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) (stating that Section 1981 plaintiffs must plead that: "(1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the

discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)").

OFA argues that Adam's claims fail for the following reasons: (1) Adam fails to allege an existing contractual relationship; (2) Adam fails to allege an actionable adverse action; (3) Adam fails to allege that she applied for and was denied a position which was given to a similarly situated non-African American candidate; and (4) to the extent she applied for and was denied such a position, a claim based on that circumstance is time barred. *See* R. 57.

## I.      Contractual Relationship

As previously noted, in addition to the elements necessary to establish discrimination, "proof of a contractual relationship is necessary to establish a § 1981 claim." *Walker v. Abbott Labs.*, 340 F.3d 471, 475 (7th Cir. 2003). The Seventh Circuit has held that Congress intended the word "contract" in Section 1981 to have its "ordinary meaning." *Id.* In applying the statute and determining whether a contractual relationship existed in *Walker*, the Seventh Circuit looked to the Restatement of Contracts, which defines "contract" as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty." *Id.* (quoting Restatement (Second) Of Contracts § 1 (1981)). According to the Restatement, "the formation of a contract"— with exceptions not relevant here—is not simply a mere "agreement . . . of mutual assent," but is a special kind of agreement consisting of a "bargain . . . to exchange promises or to exchange a promise for a performance or to exchange performances."

Restatement (Second) Of Contracts §§ 3, 17. This bargained for exchange is what is known as "consideration." *Id.* § 17 ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."); *id.* § 71(1) ("To constitute consideration, a performance or a return promise must be bargained for."). "A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Id.* § 71(2). An exchange requires both "that the promise induces the conduct of the promisee [and] that the conduct of the promisee induces the making of the promise." Restatement (Second) Of Contracts § 71, comment b.

Adam contends that she formed a contract with OFA by performing services in exchange for use of a laptop computer and access to "the internship itself." R. 62 at 10-11. She also argues that a contract was formed because OFA promised to "act[] in accordance with the policies explained at the orientation." *Id.* at 11.

Adam's allegations fail to establish that she had a contractual relationship with OFA. First, use of the laptop does not constitute consideration because Adam does not allege that it was bargained for. *See* Restatement (Second) Of Contracts § 71(1). For the laptop to be consideration in a bargain, Adam would have to allege that she accepted the internship and agreed to perform services for OFA (at least in part) because OFA *promised* her a laptop. *Id.* § 71(2). But Adam does not allege that OFA promised her use of a laptop in order to induce her to accept the internship. Rather, Adam alleges that she sought out an internship position independent of any

promise of material consideration from OFA. As OFA argues, Adam's use of the laptop is akin to a soup kitchen providing a volunteer with a ladle. R. 57 at 11 n.2 (citing *Holder v. Town of Bristol*, 2009 WL 3004552, at *5 (N.D. Ind. Sept. 17, 2009)). The laptop, like the ladle, was provided in order for Adam to be able to perform her work as an intern; it was not promised in compensation or remuneration for performing her work as an intern. Absent such a promise, use of the laptop is not consideration for which Adam bargained. Thus, OFA's provision of a laptop to Adam was not consideration for her work, and did not create a contractual relationship between them.

Second, "the internship itself"—by which Adam presumably means the privilege and prestige of association with OFA—does not constitute consideration because Adam cannot allege that she received it in an exchange with OFA. Adam's contention is that she agreed to perform work for OFA in exchange for the prestige of the position, and that OFA allowed her to have access to the prestige in exchange for her agreement to perform the work. But since not all agreements are contracts, for Adam's agreement with OFA to constitute a contract, Adam's allegations must plausibly demonstrate that she engaged in an exchange of consideration with OFA. *See* Restatement (Second) Of Contracts §§ 3, 17, 71. An exchange of consideration is said to exist when both "that the promise induces the conduct of the promisee [and] that the conduct of the promisee induces the making of the promise." *Id.* § 71, comment b; *see also* Merriam-Webster Online Dictionary, www.merriam-webster.com (last visited Sept. 28, 2016) (An "exchange" is "the act of giving or

taking one thing in return for another."). By being "induced" to exchange consideration, the parties to an agreement to exchange consideration (i.e., a contract) have demonstrated that they agree that there is a relationship between the parties' promises of consideration in the form of "if you give me A, I'll give you B." In other words, the giver of A is induced to give up A *because* he wants B, and vice versa. So here, for "the internship itself" to be consideration for Adam's performance of the internship work, OFA must have been *induced* to offer Adam an internship position by some valuable skill or characteristic Adam possessed that she would have used to benefit OFA through her willingness to work. But Adam does not allege any such thing. Rather, if Adam had not expressed interest and applied for the internship, OFA would have found someone else to fill the position (or let the position go unfilled). Since OFA would have filled (or not filled) the position regardless of Adam's interest, OFA did not give up anything in exchange for Adam's performance, and Adam cannot be said to have "exchanged" her performance with OFA in return for the internship opportunity. Since OFA cannot be said to have "exchanged" the opportunity to work as an intern for Adam's work performance, "the internship itself" is not consideration and cannot form the basis of a contract.

Lastly, Adam contends that OFA made promises to her in the form of policies providing for "protection from discrimination and illegal employment actions," which were reviewed at her orientation. *See* R. 62 at 13. The Court questions whether Adam has alleged with sufficient detail the promises OFA made with regard to "protection from discrimination and illegal employment actions." But to

the extent Adam has sufficiently alleged that OFA made certain promises, Adam has failed to allege that she received these promises in a bargained for exchange. The analysis revealing this failure is analogous to the Court's analysis of Adam's allegations that the laptop and "the internship itself" constituted consideration, discussed above. Absent such a bargained for exchange, any promise OFA may have made cannot form the basis of a contractual relationship.

In her complaint, Adam cites Illinois case law that "an employee handbook or policy statement may create contractual rights." *Doyle v. Holy Cross Hosp.*, 708 N.E.2d 1140, 1144 (Ill. 1999).[1] But Adam ignores the fact that this is only true "if the traditional requirements for contract formation are satisfied." *Id.* In *Doyle*, the Illinois Supreme Court held that employers must provide consideration in exchange for the right to change provisions in employee handbooks or policy statements governing their paid employees, in order for such provisions can be said to have been incorporated into the employee's contract. *See id.* Contrary to Adam's contentions, Illinois courts have not held that the existence of the handbooks and policies themselves create a contractual relationship. Rather, the handbooks and policies can be incorporated into an already existing employee contractual relationship that is based in the consideration that is the employee's wages or salary. Adam has not sufficiently alleged that she had a contractual relationship

---

[1] Adam cites *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314 (Ill. 1987), R. 52 at 1, but *Doyle* is the more recent decision on the same issue.

with OFA to begin with, and the policies reviewed at her orientation do not bring one into existence.

This analysis is in accord with the few courts that have addressed the issue of whether unpaid interns are protected by Section 1981. *See Marvelli v. Chaps Cmty. Health Ctr.*, 193 F. Supp. 2d 636, 659 (E.D.N.Y. 2002) (dismissing § 1981 claim bought by interns because they were not employees and because of the absence of "economic remuneration or the promise thereof"); *Hagemann v. Molinari*, 14 F. Supp. 2d 277, 286 (E.D.N.Y. 1998) (unpaid volunteer "was not a party to any contract with the" defendant); *Hollander v. Sears, Roebuck & Co.*, 450 F. Supp. 496, 505 (D. Conn. 1978) ("in substance [the internship program] was not a contract for services between an employer and employee").[2] Adam cites cases in which courts found that unpaid interns or volunteers were found to be employees for purposes of Title VII's protections. *See*, *e.g.*, *Volling v. Antioch Rescue Squad*, 2012 WL 6021553, at *8 (N.D. Ill. Dec. 4, 2012); *Rafi v. Thompson*, 2006 WL 3091483, at *1 (D.D.C. Oct. 30, 2006). Although courts use the same elements to determine whether employers *discriminated* against employees in both Title VII and Section 1981 claims, *see Lane v. Riverview Hosp.*, 2016 WL 4492397, at *2 (7th Cir. Aug. 26,

_____

[2] In *Juarez v. Northwestern Life Insurance Co., Inc.*, the court held that a plaintiff who was denied an "intern" position on the basis of his alienage had stated a claim under Section 1981. 69 F. Supp. 3d 364, 370-71 (S.D.N.Y. 2014). The court, however, did not analyze whether the plaintiff had a "contractual relationship" with the defendant. Presumably this is because the plaintiff was asked to submit "employment documents," indicating that the position the plaintiff sought was paid, creating a strong basis for the existence of a "contractual relationship," despite the fact that the defendant was alleged to have been recruiting "interns." *Id.* at 367. Adam's was not a paid position, so *Juarez* is unpersuasive in this case.

2016), the statutes have different threshold requirements: Title VII asks whether the plaintiff is an "employee," whereas Section 1981 asks whether the plaintiff has a "contractual relationship" with the defendant. Indeed, when the Seventh Circuit was faced with the question of whether an at-will employee had stated a claim under Section 1981, it analyzed whether the plaintiff had a "contractual relationship" with the defendant, not whether the plaintiff was the defendant's "employee." See *Walker*, 340 F.3d at 475. It may be that there is not a principled basis for this statutory distinction considering that both statutes seek to prevent and penalize racial discrimination in employment. Nevertheless, the Court must apply the statute as promulgated by Congress and interpreted by the Seventh Circuit. Accordingly, cases finding that unpaid interns or volunteers are "employees" under Title VII are not relevant to determining whether an unpaid intern has a "contractual relationship" with an employer under Section 1981.

None of Adam's allegations of consideration—the laptop, the "internship itself," the handbook policies—are sufficient to plausibly allege that she formed a contract with OFA. Therefore, since both the Section 1981 and breach of contract claims require a contractual relationship and Adam's allegation do not demonstrate that one is present here, Adam's claims are dismissed.

## II.    Adverse Actions

Even if Adam had plausibly alleged that she had a contractual relationship with OFA, her Section 1981 claims would still fail because she has not plausibly alleged that OFA subjected her to an adverse action. To prevail on either a

discrimination or retaliation claim under Section 1981 in the employment context, a plaintiff must allege that her employer subjected her to adverse actions. *See Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016); *Morgan*, 724 F.3d at 995. In the employment context, federal law "does not protect against petty slights, minor annoyances, and bad manners," *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016), and "is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 406 (7th Cir. 2010). Rather, "an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm." *Chaib v. Indian*, 744 F.3d 974, 982 (7th Cir. 2014). This means that the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). In other words, "[i]n a discrimination case, a materially adverse employment action is one which visits upon a plaintiff a significant change in employment status." *Boss*, 816 F.3d at 917. "Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Id.*; *see also Lewis v. City of Chi.,* 496 F.3d 645, 653 (7th Cir. 2007) ("For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits."). But whether with regard to discrimination or retaliation claims, "not everything that

makes an employee unhappy is an actionable adverse action." *Poullard*, 2016 WL 3924375, at *8.

## A.    Discrimination

With respect to her discrimination claim, Adam makes the following allegations that she contends constitute adverse actions in the context of Adam being the only African-American in OFA's political department: (1) the other interns excluded her and acted in a demeaning manner towards her; (2) Cummings grabbed her hair and touched her skin; (3) Witt screamed at her; (4) Cummings and Witt suggested she apply for the African American Leadership Council to the exclusion of other opportunities; and (5) she was demoted from "intern" to "volunteer." The first four of these do not describe "significant changes" in Adam's "employment status," and thus are not adverse actions. Although all four instances can be described as impolite, none changes Adam's "wealth" or "career prospects." And although they might be characterized as "humiliating" or "degrading," Adam's allegations fail to rise to the level that the Seventh Circuit has held is necessary to demonstrate a "significant negative alteration in the workplace." *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 982 (7th Cir. 2008) (holding that scolding an employee for absence by introducing the employee by saying, "This is Amy, you probably haven't met her yet because she is never here," may have been "offensive" to the employee, but was merely a "petty slight" that "does not amount to a materially adverse action"); *Rhodes v. Ill. DOT*, 359 F.3d 498, 505 (7th Cir. 2004) (job reassignment, being marked absent in a manner inconsistent with company policy, being assigned

uncomfortable and inconvenient tasks "constitute mere temporary inconveniences and do not rise to the level of an adverse employment action"); *Bell v. E.P.A.*, 232 F.3d 546, 554-55 (7th Cir. 2000) ("demeaning assignments, verbal abuse, surveillance, diminished responsibilities, refusal to cooperate on job assignments, and placements in situations designed to result in failure" even in the aggregate, "do not rise to the level of actionable retaliation"); *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1039 (7th Cir. 1998) ("ostracism by fellow workers . . . . is not an adverse employment action where the plaintiff did not allege that the ostracism resulted in a reduced salary, benefits, seniority, or responsibilities" (citing *Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir. 1998))); *see also Somoza v. Univ. of Denver,* 513 F.3d 1206, 1214-15 (10th Cir. 2008) (isolated incidents of co-worker incivility at a meeting, including eye-rolling, laughing at plaintiff's opinions, and commenting behind his back, were not materially adverse).

The alleged incident in which Cummings grabbed Adam's hair is troubling, but it is an isolated incident, and therefore is does not rise to the level of an adverse action. *See Kampmier v. Emeritus Corp.,* 472 F.3d 930, 941 (7th Cir. 2007) ("[S]ustained physical contact can raise otherwise merely objectionable conduct to the level of objectively offensive conduct."). The alleged incident in which Cummings touched Adam's skin and said "ooh" is entirely ambiguous and does not plausibly allege intent to intimidate or humiliate Adam. Importantly, neither of these incidents plausibly demonstrates a "significant negative alteration in [Adam's] workplace environment."

Adam's argues that her alleged demotion from "intern" to "volunteer" damaged to her "career prospects." Although being given a "less distinguished title" can be an adverse action, "a difference in job title alone—where the positions are identical in terms of work, pay and benefits—is not materially adverse." *Atanus v. Perry*, 520 F.3d 662, 678 (7th Cir. 2008) (citing *Grayson v. City of Chicago*, 317 F.3d 745, 749-50 (7th Cir. 2003)); *see also Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) (holding that a transfer and job title change from assistant vice-president and manager of one bank branch to a loan officer position at a different branch "alone is not enough to constitute a materially adverse employment action"). Adam has not alleged that interns had different responsibilities from volunteers. And both positions were unpaid. According to Adam's allegations, the only differences between interns and volunteers was prestige and the use of laptop computers provided by OFA. Other than these minor changes in Adam's employment status, she was still doing unpaid work for OFA in the same office and with the same staff she worked with as an intern. *Stephens v. Erickson*, 569 F.3d 779, 791-92 (7th Cir. 2009) (reassignment was not plausibly an adverse action, even though the plaintiff alleged that his new job was "less desirable," because the defendant "altered his job duties only minimally" and "[h]is new tasks [were] not dirtier, more arduous, less prestigious, or objectively inferior, nor do they possess any analogous attribute."); *O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) ("As we have stated before, being shifted to an essentially equivalent job that [an employee does] not happen to like as much does not a Title

VII claim create."). Furthermore, Adam attached a copy of a page of the OFA website to her complaint that states that "internship positions are . . . volunteer positions." R. 52 at 18. Thus, Adam's allegation that she was "demoted" from intern to volunteer is not plausible and does not constitute an adverse action.

### B.   Retaliation

In contrast to claims of discrimination, "[i]n the retaliation context, the challenged adverse action need not be one that affects the terms and conditions of employment." *Poullard v. McDonald*, 2016 WL 3924375, at *7 (7th Cir. July 21, 2016). Rather, Section 1981 "forbids any retaliatory actions that are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Shott*, 829 F.3d at 497. "The anti-retaliation provision," however, "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Poullard*, 2016 WL 3924375, at *8.

Of Adam's allegations, only Witt's screaming and the demotion from intern to volunteer occurred after Adam began complaining to human resources about her working conditions, and thus have the temporal characteristics of retaliation. Witt's screaming is insufficiently material to factor into a reasonable employee's decision to make a complaint. *See Stephens,* 569 F.3d at 790 (noting that being yelled at by supervisors is not an actionable harm); *Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008) ("being addressed in a loud, unprofessional tone during one meeting does not satisfy the requirement that the offensive conduct be severe and pervasive."). Adam's "demotion," however, might have dissuaded a reasonable person from

making further complaints, despite the fact—as already explained—that Adam failed to allege that her demotion affected the terms and conditions of her employment. After all, the demotion could reasonably be viewed as a threat of future adverse actions. The problem for Adam's retaliation claim is that that Seventh Circuit has held that threats that "deter" a plaintiff from complaining, but that do not actually "harm" the plaintiff, cannot be the basis for a retaliation claim. *Poullard*, 2016 WL 3924375, at *8. As discussed, Adam did not suffer any harm from being demoted to "volunteer." Absent an injury, she cannot plausibly state a claim for retaliation. *See Washington v. Ill. Dep't of Revenue,* 420 F.3d 658, 662 (7th Cir. 2005) (noting that "[b]y and large a reassignment that does not affect pay or promotion opportunities lacks th[e] potential to dissuade and thus is not actionable").

### C.    Hostile Work Environment & Constructive Discharge

To the extent that Adam intends to allege a hostile work environment or constructive discharge claim, that claim is also dismissed. To succeed on a hostile work environment claim, a plaintiff must demonstrate that "the environment was both subjectively and objectively offensive," and that the conduct constituting the hostile environment was "severe or pervasive." *Poullard*, 2016 WL 3924375, at *9. A constructive discharge claim requires a showing of "unbearable" working conditions; i.e., evidence of a hostile work environment that has grown so oppressive that the law recognizes it is appropriate for the plaintiff to quit. *Wright v. Ill. Dep't of Children & Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015) ("[S]uch cases require a

plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit.").

Here, Adam has alleged that her co-workers and supervisors were mean to her and humiliated her. Generally, rude or impolite interactions with co-workers are insufficient to support a claim for hostile work environment. *See Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (no hostile work environment claim where employee alleged that her supervisor "treated her in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work"); *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625-26 (7th Cir. 2004) ("unfriendly" behavior of co-worker insufficient for hostile work environment). Furthermore, the Seventh Circuit has held that work place environments much worse than Adam's were not actionable. *See, e.g., Moser v. Ind. Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005) (plaintiff's allegations that another employee engaged in a "daily non-ceasing quest to denigrate" female employees, which included incidents in which he "spoke down to her and other female employees," "made a reference to her 'tits,'" made various juvenile remarks or jokes about penises, and "told several new male employees to watch out because Ms. Moser likes good-looking men," did not rise to the level of creating an objectively hostile work environment); *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 552 (7th Cir. 2002) (isolated, indirect incidents of racial harassment,

such as use of the word ["n****r"] in plaintiff's presence held not severe and pervasive enough to alter conditions of employment); *Silk v. City of Chicago*, 194 F.3d 788, 796, 807 (7th Cir. 1999) (rejecting hostile workplace claim under ADA, where two intermediate supervisors variously called [the plaintiff] a "useless piece of [vulgarity]," a "medical abuser," intimated that they should "kick his [vulgarity]" for malingering, and made references to his "[vulgarity] medical problems," and holding that it did not constitute actionable harassment because "simple teasing," offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment"); *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (concluding that plaintiff was not constructively discharged where she was excluded from office activities, unfairly reprimanded, assigned undesirable sales territory, denied new accounts, barred from supervising two white employees, and refused assistance from her boss). Adam has not alleged anything this severe. And since her allegations fail to state a claim for a hostile work environment, they cannot meet the higher standard of constructive discharge either.

## IV. Failure to Promote or Interference with Contract

Adam also alleges that "[p]articipating in the campaign as an intern or employee increase[s] opportunity to be hired onto the campaign." R. 52 at 3. To the extent that Adam means to allege that OFA interfered with a future contract or failed to promote her, that claim is dismissed. A "prima facie case for failure to promote requires [the plaintiff] to show that [she] applied for the position sought."

*Shott v. Rush Univ. Med. Ctr.*, 2016 WL 3316618, at *3 (7th Cir. June 15, 2016) (citing *Carter v. Chi. State Univ.*, 778 F.3d 651, 660 (7th Cir. 2015)). Adam has not alleged she applied for any position at all, let alone a position for which she was rejected. And since Adam has not identified a position she sought and for which she was rejected, she of course cannot allege that a non-African American "who was not better qualified for the position that she sought" was hired instead. *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016).

Even if Adam had sufficiently alleged a failure to promote or interference with contract claim, it is time barred under Section 1981. A four-year statute of limitations applies to Section 1981 claims regarding the performance and enjoyment of current contracts, whereas a two-year statute of limitations applies to Section 1981 claims regarding interference with prospective contracts. *See Porter v. Pipefitters Ass'n Local Union 597, U.A.*, 2013 WL 5162206, at *3-4 (N.D. Ill. Sept. 12, 2013) (citing cases); *see also Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665 (7th Cir. 2014). Although Adam's claims for discrimination and retaliation during her internship are governed by a four-year statute of limitations, any claim for failure to hire or interference with a prospective contract after her internship is subject to a two-year statute of limitations. Since Adam's filed this case in 2015, more than two years after the alleged events took place in 2011, her claims for failure to promote or interference with a prospective contract are untimely, and dismissed for that reason as well.

## Conclusion

For the foregoing reasons, OFA's motion to dismiss, R. 56, is granted. Adam's complaint is dismissed without prejudice. If Adam believes she can cure the deficiencies the Court has identified in her complaint, she should file a motion (of no more than five pages) for leave to amend her complaint by October 28, 2016. The motion should attach a proposed amended complaint and should explain how the proposed amended complaint cures the deficiencies in the current complaint. OFA should not file a brief responding to Adam's motion to amend (should she choose to file one) unless the Court requests it. If Adam does not file a motion to amend by October 28, 2016, her case will be dismissed with prejudice.

ENTERED:

_Thomas M Durkin_

_____

Honorable Thomas M. Durkin
United States District Judge

Dated:  September 28, 2016